# Exhibit D

2012 WL 874419
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Celia K. DANIEL, Plaintiff,
v.
SARGENT & LUNDY, LLC and ABM Janitorial Services—North–Central, Inc., Defendants.

No. 09 C 7206.
|
March 14, 2012.

**Attorneys and Law Firms**

Scott P. Clair, Sara Ann Eber, Thompson Coburn LLP, Chicago, IL, for Plaintiff.

Harry Sangerman, Kathryn E. Siegel, Littler Mendelson, P.C., Robert Thomas Zielinski, Dionne R. Hayden, Miller, Canfield, Paddock and Stone PLC, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

MATTHEW F. KENNELLY, District Judge.

*1 Celia K. Daniel has sued her employer, ABM Janitorial Services—North–Central, Inc. (ABM), and the business at whose offices she worked, Sargent & Lundy, LLC (S & L). She asserts a claim of race discrimination pursuant to Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e–5(f)(1), and 42 U.S.C. § 1981(a). Both defendants have moved for summary judgment. For the reasons stated below, the Court grants ABM's motion and denies S & L's motion.

### Background

ABM provides cleaning services to offices and buildings in Chicago. Daniel, who is African–American, began working for ABM on February 20, 2008. During her time working for ABM, she was a member of a labor union, the Service Employees International Union, Local No. 1.

Initially, Daniel worked as a floater, a temporary employee who filled in when other employees were on vacation or unable to work. She worked at many different offices and buildings. As a floater, she had lower wages than permanent employees assigned to specific buildings, and she did not receive benefits or seniority rights.

In September 2008, after working six months as a floater, ABM assigned Daniel to work as a permanent employee at the offices of S & L in downtown Chicago. As a permanent employee, Daniel received benefits and began to accrue seniority, although the collective bargaining agreement stated that her seniority applied only as long as she worked at the S & L offices. At the offices, she worked as a "day matron," a day-shift janitor. Her primary duties were to clean public areas such as lunch rooms and conference rooms, fill paper towel and soap dispensers, and check on the conditions of the women's restrooms. At S & L, Daniel worked with two other ABM matrons, Dusanka Sudar, who is white, and Alejandra Sandoval, who is Hispanic. A white ABM porter, Zeljko Delac, also worked at S & L's offices.

At S & L, the ABM matrons interacted with Moises Lopez, who is Hispanic. Lopez was an S & L employee. He was a supervisor who had responsibility for the mail room, security, and some maintenance tasks. As part of his job, he also monitored the performance of ABM and ABM's employees at S & L. The parties dispute the amount of authority he had over ABM's on-site personnel and how frequently he interacted with them.

When Lopez first took responsibility for the ABM matrons in 2006, he spoke with Blagi Premovic, an ABM employee who managed the S & L account. Premovic told Lopez that one of the matrons working at S & L, Dzevahire Jahovic, who was white, had received a written warning for deficient performance at S & L. Over the next two years, Lopez received multiple complaints from S & L employees that Jahovic had not cleaned the areas for which she was responsible. He testified that he passed these warnings along to Premovic but did not do anything else. In 2008, Lopez heard Jahovic speaking negatively about S & L managers and using obscenities to describe them. He contacted Premovic to complain. Premovic took the problem to the ABM human resources division, and ABM and S & L agreed that Jahovic would be transferred away from S & L's offices. During his deposition, Lopez testified that ABM suggested transferring Jahovic and that he agreed. S & L Ex. 5 at 18.

**\*2** Daniel had worked at S & L a few times as a floater, and Lopez was happy with her work. After ABM transferred Jahovic away from the S & L offices, Lopez requested that they assign Daniel to the position, and ABM did so. Lopez testified that he never received complaints about Daniel's cleaning work during the time she worked at S & L. S & L Ex. 5 at 51–52. Daniel did eventually did have trouble at S & L, however, involving her alleged misuse of S & L conference rooms.

When Daniel started working at S & L, Sudar (another ABM matron) showed her around and explained the basic tasks of the job. Sudar testified during her deposition that she also told Daniel never to use S & L conference rooms or quiet rooms for any reason and that she should enter the conference rooms just to clean them and then leave immediately. S & L Ex. 7 at 63. Olga Tin, Lopez's supervisor at S & L and an Asian–American, testified in a deposition that she began to receive complaints about Daniel in May or June 2009. S & L Ex. 4 at 10–11. The complaints were that Daniel was using S & L conference rooms to do homework or sleep. *Id.* at 11. Tin instructed Lopez to call ABM to complain, and Lopez later informed her that he had done so. *Id.* at 11–12. Tin received three more complaints about Daniel using the conference rooms in May–July 2009. *Id.* at 15, 17. Each time, she instructed Lopez to complain to ABM, and he told her that he had done so. *Id.* at 18. Tin testified that she received a fifth and final complaint about Daniel in June or July 2009 and that she instructed the complainant to take the problem to Lopez immediately. *Id.* at 19–21.

Lopez recalled the events somewhat differently. First, he stated that after he received several complaints about the matrons in general, he had a short meeting with all of the matrons about not using the conference rooms. S & L Ex. 5 at 36–37. He also called ABM to report the complaints. *Id.* at 66. Then in March 2009, he talked to Daniel about using the conference rooms for personal reasons after Tin told him she had received several complaints. *Id.* at 60–61. He told her that the conference rooms were not for personal use, and he offered her the use of the mail room, which he supervised, if she needed personal space. *Id.* at 62–63. Lopez stated that he was not particularly interested in talking to Daniel about the times she had used the conference rooms but rather just wanted to make sure she knew she could use the mail room. *Id.* at 62. Lopez reported to Tin that he had talked to Daniel and also mentioned the problem to Premovic, the ABM representative, in a phone call a few days later. *Id.* at 64–65. Lopez told Premovic that it would not be necessary to speak to ABM's human resources division about the problem. *Id.* at 66. Lopez testified that he did not tell Daniel that there would be any consequences from use of the conference rooms and that he did not think there would be any. *Id.* at 66–67. He did not receive any more complaints about Daniel using the conference rooms until her last day of work at S & L. *Id.* at 65, 67.

**\*3** Daniel's description of what she was told about conference room usage differs from those of Lopez and Tin. In her deposition, she testified that no one had told her that she could not use the conference rooms when she started. S & L Ex. 8 at 67–68. Eventually, Lopez told her not to eat in the conference rooms, but she was never told that she could not make phone calls from the conference rooms or otherwise use them for personal reasons. *Id.* at 68–70. She testified that Lopez never had a group meeting to discuss conference room use and that he generally spoke to each ABM matron individually. *Id.* at 70–71. When she talked to Lopez, she did not understand him to be saying that there were complaints about her using the conference rooms. *Id.* at 71. Instead, she thought that S & L employees had complained that she was taking and eating food left over from various S & L meetings in the conference rooms. *Id.* at 71–72. She did understand, however, that S & L did not permit her to sleep or do homework in the conference rooms. *Id.* at 68–70.

It is undisputed that on August 26, 2009, Lopez received a complaint that a matron was sleeping in a conference room. Lopez went to the conference room and found Daniel there. He testified that the lights were off and that Daniel's head was tilted to the side as though she was sleeping and that when he turned on the lights, Daniel looked up sleepily. S & L Ex. 5 at 69–70, 72. Daniel denies that she was sleeping at the time but does not deny that she was in the conference room. S & L Ex. 8 at 99–101. Lopez sent Daniel home and called Premovic to report the incident. Lopez testified that Premovic offered to remove Daniel, but Lopez initially said no. S & L Ex. 5 at 77. Later, he changed his mind. The next day, Lopez sent Premovic an e-mail providing additional details. Lopez testified that he "felt that it was time to possibly transfer" Daniel, but his e-mail stated, without qualification, that "we can no longer allow Celia Daniel to continue to work at Sargent & Lundy." *Id.* at 78; S & L Ex. 6 at 1.

Premovic informed Irina Feldman, ABM's Regional Director of Human Resources, of Lopez's complaint and e-mail. Feldman concluded that ABM had to remove Daniel from the S & L offices. On August 27, 2009, the same day that

Lopez sent the e-mail, Daniel did not go to work at S & L but instead met at ABM's Chicago office with Raul Garcia, an ABM operations manager. Garcia told Daniel that she would be suspended without pay while ABM investigated the incident at S & L's offices. Daniel disputes that ABM ever conducted any investigation. On September 9, Garcia and Sylwia Krawczyk, an ABM human resources specialist, contacted Daniel to tell her that ABM's investigation had concluded. Krawczyk told Daniel that she would still be able to work for ABM but that only floater positions were available. As a consequence, Daniel would be paid less, would not have benefits, and would lose the seniority she had accrued working at S & L. Krawczyk also told Daniel that there was no certain date by which she would be assigned to another permanent position.

 *4  Daniel agreed to these terms, and Krawczyk told her to come to ABM's offices on September 14, 2009, to sign some paperwork. Before doing so, Daniel filed a union grievance regarding her removal from the S & L position. When she arrived at ABM's offices on September 14, Krawczyk told her that the grievance had to be resolved before Daniel could receive a new assignment. In response, Daniel resigned.

As a replacement for Daniel, ABM provided S & L with Amina Sewalim, who is Hispanic. Lopez testified that he was familiar with Sewalim's work as a floater and that he assented when Garcia suggested sending her over. S & L Ex. 5 at 84–85. At one point, Lopez testified that he and Sewalim spoke Spanish together, but he later stated that he always spoke English with both her and Sandoval. *Id.* at 84, 91–92. During his deposition, Garcia stated that Lopez requested Sewalim as the replacement for Daniel, although he did "not really" request her by name. Pl. S & L Resp., Ex. 10 at 21.

**Discussion**

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.,* 629 F.3d 653, 656 (7th Cir.2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, Daniel asserted claims of race, color, and gender discrimination, sexual and racial harassment, and retaliation. After receiving both defendants' summary judgment motions, she moved to withdraw all but the race discrimination claim, and the Court dismissed the other claims with prejudice. On the remaining race discrimination claim, S & L contends that it is entitled to summary judgment because it was not Daniel's employer. Both S & L and ABM contend that there is no evidence from which a reasonable jury could conclude that they discriminated against Daniel on the basis of race.

**A. Employer status**

"[O]nly the employee's employer ... may be held liable under Title VII." *Robinson v. Sappington,* 351 F.3d 217, 332 n. 9 (7th Cir.2003). It is undisputed that Daniel was an employee of ABM. Accordingly, S & L can be liable on Daniel's discrimination claim only if it may also be considered to have been Daniel's employer. Even though ABM officially employed Daniel and S & L did not, S & L could have been her de facto or indirect employer. To be a de facto employer, S & L must be "so extensively involved with the plaintiff's day to day employment that [it] is the 'real' employer for all intents and purposes, including Title VII liability." *Kerr v. WGN Cont'l Broad. Co.,* 229 F.Supp.2d 880, 886 (N.D.Ill.2002).

 *5  S & L argues that the Seventh Circuit has not determined whether a de facto or joint employer can be liable for race discrimination under Title VII. In *Brown v. North Chicago,* No. 04 C 1288, 2006 WL 1840802 (N.D.Ill. June 28, 2006), the court stated that "whether a joint employer theory is applicable to discrimination cases is an unsettled question in this Circuit" before concluding that the joint employer theory should apply because otherwise an employer would be able to discriminate freely simply by using temporary employees. *Id.* at *6–7; *see Piano v. Ameritech/SBC,* No. 02 C 3237, 2003 WL 260337, at *5 (N.D.Ill. Feb.5, 2003) (stating that Seventh Circuit had not decided whether a joint employer could be liable under Title VII, but concluding that such an employer could be liable for the same reasons). The Seventh Circuit, however, has stated that the indirect employer "concept is ... well established in the ... context of Title VII." *EEOC v. Illinois,* 69 F.3d 167, 171 (7th Cir.1995) (age discrimination case; assuming that state potentially could be liable as indirect employer of teacher directly employed by school district); *see Heinemeier v. Chemetco, Inc.,* 246 F.3d 1078, 1082–

83 (7th Cir.2001) (Title VII and the Age Discrimination in Employment Act; company that did not officially pay plaintiff and did not appear on her W–2 forms could be employer).

*Brown* and *Piano* cite *Alexander v. Rush N. Shore Med. Ctr.,* 101 F.3d 487 (7th Cir.1996), in which the court expressly left open the question of "whether an employee of employer X may bring a Title VII action against employer Y when Y is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer X." *Id.* at 493 n. 2. That, however, is not the claim that Daniel makes. Daniel does not claim that S & L interfered with her employment at ABM based on a discriminatory motive. Rather, she contends that S & L effectively was her employer and terminated that employment because of a discriminatory motive.

The Seventh Circuit may not have said whether a broad "interference" claim exists in the antidiscrimination laws. As stated above, however, it has called the narrower indirect or de facto employer theory "well established." *EEOC v. Illinois,* 69 F.3d at 169, 171. The Court concludes that if S & L is a de facto employer of Daniel, effectively making it and ABM joint employers, S & L can be liable for race discrimination.

"When facing questions regarding the employee-employer relationship under Title VII ..., we look to the economic realities of the relationship and the degree of control the employer exercises." *Heinemeier,* 246 F.3d at 1082 (internal quotation marks omitted) (noting that a major factor suggesting that defendant was an employer of plaintiff was that it set plaintiff's salary). The parties agree that the courts apply a common law test based on agency principles to determine whether a defendant is an employer of the plaintiff. *Hojnacki v. Klein–Acosta,* 285 F.3d 544, 549 (7th Cir.2002) (determining whether plaintiff was an employee of the Illinois Department of Corrections for the purposes of due process claim).

> *6 The test requires [a court] to consider five factors: (1) the extent of the employer's control and supervision over the worker, (2) the kind of occupation and nature of skill required, (3) which party has responsibility for the costs of operation, such as the provision of equipment and supplies and the maintenance of the workplace, (4) the source of payment and benefits and (5) the duration of the job. Of these factors, the extent of control and supervision over the worker is the most significant in determining the employment status.

*Id.* at 550–51 (citations omitted).

In this case, viewing the record in the light most favorable to Daniel, a reasonable jury could conclude that S & L was a de facto employer of Daniel. Daniel concedes that the third and fourth factors suggest that S & L was not her employer because ABM provided the equipment and supplies that she used in the job and paid her wages and benefits. But even though the matrons' pay came from ABM, Sudar testified that Lopez promised to give her a raise and that she received that raise. Pl. S & L Resp., Ex. 4 at 29–30; *see Piano,* 2003 WL 260337, at *5 (noting that defendant approval of plaintiff's rate of pay suggested that defendant was employer). The second and fifth factors, moreover, suggest that S & L was Daniel's employer. Her job as a matron was unskilled, so "it is safe to assume that [she] was afforded little discretion in the manner in which [s]he performed these tasks." *Brown,* 2006 WL 1840802, at *6. As to the fifth factor, Daniel only worked for about one year at S & L, but she was classified as a permanent worker there, and if not for the conference room incident she could have continued working there indefinitely. *Cf. id.* (fifth factor did not support finding that defendant was plaintiff's employer when work assignment was limited to forty hours and even if extended, plaintiff could not have worked more than eighty hours per month or more than six months each year); *Piano,* 2003 WL 260337, at *5 (noting that "plaintiff's job was, by definition, temporary").

As for the most important factor, S & L's supervision and control over Daniel, the record contains evidence that would permit a reasonable fact finder to conclude that S & L effectively controlled Daniel as she worked. Daniel testified that she was never trained by ABM and was trained as to the specifics of the S & L position once she arrived there by Sudar, an ABM matron who had experience working at S & L. S & L Ex. 8 at 21, 48. Daniel testified that over time, Lopez added to her duties and ordered her to perform additional tasks. *Id.* at 59–60. Lopez and his assistant, Donna Campbell, would also contact Daniel during the day and direct her to perform specific tasks. *Id.* at 60–61. Daniel testified that when S & L employees were unhappy with her work, they went to Lopez,

and he reprimanded her. *Id.* at 137–38; S & L Ex. 9 at 54–55. She stated that Lopez instructed her not to take lunch breaks on a particular floor of the offices and that at the end of her shift, she would go to his office so that Lopez could tell her it was time to go home. S & L Ex. 8 at 65, 67. Lopez also attempted to resolve personal disputes between the matrons, asking Daniel why she was not getting along with Sudar and Sandoval. *Id.* at 73, 76. In her position statement submitted to the Chicago Commission on Human Relations, Daniel also stated that Lopez disciplined her, she took her problems at work to him, and he gave her tasks to complete. S & L Ex. 9 at 26, 28, 33–34, 54–55, 58.

**\*7** The testimony of Daniel's fellow matrons also would allow a reasonable jury to conclude that S & L exercised control over all of ABM's matrons working at S & L. Sudar testified that Lopez assigned her and Daniel to clean floors that were not normally theirs to clean. S & L Ex. 7 at 58–59, Pl. S & L Resp., Ex. 4 at 12. Sudar also testified that she always had to tell Lopez before she left for the day and that sometimes he would let the matrons go home early. Pl. S & L Resp., Ex. 4 at 26–27. Sudar stated that if she was unable to work on a given day, she would always call Lopez first before calling ABM to arrange a replacement. *Id.* at 30. Sandoval testified that Lopez assigned floors for her to clean and that she approached Lopez about altering floor assignments when she wanted to change. *Id.,* Ex. 3 at 10–11.

Finally, it is undisputed that S & L told ABM that Daniel could no longer work for them. S & L Ex. 6 at 1. S & L also initially requested that Daniel be assigned to work there, and a reasonable jury could find that Lopez requested Sewalim as Daniel's replacement. The fact that S & L exercised the power to stop ABM's matrons from working for it and that it requested or approved certain matrons also suggests that S & L was Daniel's de facto employer. *EEOC v. Illinois,* 69 F.3d at 171–72.

In sum, a reasonable jury could conclude that S & L exercised sufficient control over the matrons that the economic reality was that they worked for S & L as well as ABM. S & L thus could be liable for race discrimination.

**B. Discrimination claim against S & L**
The same standards govern Daniel's discrimination claims under Title VII and section 1981. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403–04 (7th Cir.2007). A plaintiff may seek to show race discrimination through either the direct or indirect method of proof. *Nagle v. Calumet Park,* 554 F.3d 1106, 1114, 1119 (7th Cir.2009). Daniel argues only that she has presented enough evidence under the indirect method.

"Under the indirect method, a plaintiff must show that [s]he is a member of a protected class; [s]he was meeting h[er] employer's legitimate performance expectations; [s]he suffered an adverse employment action; and [s]he was treated less favorably than similarly situated individuals" who are not members of the protected class. *Id.* at 1119. If the plaintiff has "presented sufficient evidence to establish a prima facie case of race discrimination," then "the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the action." *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir.2005) (internal quotation marks omitted). If the employer provides such a reason, the plaintiff "must present evidence that the reason proffered by [the employer] is pretextual." *Id.* An offered reason is pretextual when the employer is lying or has fabricated the reason. *Caskey v. Colgate–Palmolive Co.,* 535 F.3d 585, 592 (7th Cir.2008). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 696 (7th Cir.2006) (internal quotation marks omitted).

**\*8** It is undisputed that Daniel, as an African–American, is a member of protected class. Daniel also suffered an adverse employment action. S & L told her she could not come back to work in its offices. This resulted in, at the least, a transfer to another position at ABM and, in this case, it resulted in Daniel's demotion and (arguably) her resignation. S & L contends, however, that Daniel was not meeting work expectations and that similarly situated employees were not treated differently.

A reasonable jury could conclude that Daniel met S & L's legitimate performance expectations. S & L claims only that Daniel violated its rule against personal use of its conference rooms by the matrons. But a reasonable fact finder could conclude that S & L did not expect the matrons to follow the policy strictly or that it was not regarded as significant. Daniel testified that she was unaware that she was not allowed to use the conference rooms or make calls in them, even though she had been told she could not eat or sleep in the conference rooms. Lopez testified that he told Daniel that the conference rooms should not be used for personal reasons but that he was focused on offering her space in the mail room and did not see any consequences arising from Daniel's violation of the rule. On the day that Daniel was sent home, she admitted that she was in a conference room but denied that she was sleeping. In

any event, Daniel disputes that she was told she could not use the conference rooms. Premovic, ABM's account manager, testified that he had never received any complaints about Daniel before the day she was sent home.[1] S & L Ex. 2 at 10–11. From this and other evidence, a reasonable jury could find that Daniel was meeting S & L's performance expectations.

[1] Lopez and Tin testified that every time they received a complaint, they ensured that ABM was told of the complaint.

As to similarly situated individuals, there is evidence from which a reasonable fact finder could conclude that even though Jahovic, who was white, was eventually transferred away from S & L, she was treated more leniently than Daniel. When Lopez first became responsible for the ABM matrons, he learned from Premovic that Jahovic had already been disciplined for poor performance and had received a written warning. Lopez then received multiple complaints that Jahovic was not cleaning the areas to which she was assigned. Even so, Jahovic continued to work at S & L for two years. A reasonable jury could find that Lopez treated Daniel more severely for less serious infractions. *See Gordon v. United Airlines, Inc.,* 246 F.3d 878, 887–88 (7th Cir.2001) (similarly situated employees had been treated differently when only other employee to commit the same infraction had been warned instead of terminated, and other employees with similar infractions had only received warnings even when they already had warnings in their files).

Additionally, there is evidence that arguably shows that Lopez treated Sandoval, who is Hispanic as he is, better than he treated Daniel. In an affidavit, Daniel stated that she was often given extra work that Sandoval was not assigned. Pl. S & L Resp., Ex. 2 ¶ 4. In particular, she states that on one occasion she was assigned to vacuum nearly an entire extra floor of the offices. *Id.* Sandoval was assigned to work on the same floor, but she spent most of her time in a room with Lopez and only had to wipe down a single table. *Id.* Sudar also testified that she and Daniel were assigned to clean an extra floor multiple times but that Sandoval never was until Sudar complained. S & L Ex. 7 at 58–60.

*9 Daniel has provided enough evidence that a reasonable jury could find that she has established a prima facie case of race discrimination. S & L has offered a non-discriminatory reason for barring her from its offices, specifically that she violated S & L's rule against personal use of the conference rooms. A reasonable jury could find, however, that S & L's proffered reason is pretextual. As discussed above, there are disputed facts regarding what Daniel was told about the alleged rule against conference room usage and whether and Lopez had warned her against using the conference rooms. Further, S & L's own employees disagree on how serious Daniel's use of the conference rooms was and how many complaints there were about her use. Tin testified that she received four different complaints that she instructed Lopez to take to ABM and that he had done so. Lopez, however, testified about only one instance in which he spoke to Daniel and ABM about conference room use, and he stated that he did not believe that it was a serious problem. As discussed above, Premovic did not remember receiving any complaints from S & L about Daniel. The discrepancies regarding the understanding of Daniel's previous alleged violations of the conference room policy, not to mention Premovic's testimony that he never received any complaints, would support a reasonable fact finder's inference that S & L made up its claimed reason for barring Daniel from its offices. *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1182–83 (7th Cir.2002) (when evidence can support inference that employer's offered reason was a lie, reason could be pretextual); *Gordon,* 246 F.3d at 889–91 (when employer offered inconsistent definitions of infraction committed by employee and infraction was rarely committed, it was sufficient evidence that employer's reason was a pretext).

For these reasons, the Court declines to grant summary judgment in favor of S & L.

**C. Discrimination claim against ABM**
ABM contends that Daniel cannot establish a prima facie case of race discrimination against ABM and that it has a non-pretextual reason for taking its actions against Daniel. Even if Daniel could establish a prima facie case, ABM is entitled to summary judgment, because Daniel cannot show that ABM's stated reason for its actions was pretextual. *See Ptasznik,* 464 F.3d at 696–97.

ABM moved Daniel from her position at S & L, temporarily suspended her, and eventually offered to give her a floater position that amounted to a demotion. Daniel concedes that no other permanent positions were available at the time. ABM's stated reason for demoting Daniel is that Premovic received an e-mail from Lopez stating that Daniel had been caught sleeping in a conference room and that "we can no longer allow Celia Daniel to continue to work at Sargent & Lundy. I appreciate your immediate assistance in this matter and would like to request a permanent replacement effective

immediately." S & L Ex. 6 at 1. Premovic forwarded the e-mail to Feldman, a human resources director at ABM, who agreed that Daniel had to be removed from S & L. ABM Ex. G at 5. Explaining her decision, Feldman testified that "the client is saying one of our employees was caught sleeping on the job. They wanted her removed. I'm not going to argue. We're in customer service here." ABM Ex. B at 9. Premovic testified that he did not recall any earlier complaints from S & L about Daniel. S & L Ex. 2 at 10–12. Likewise, Feldman said that she had never received a complaint about Daniel before. ABM Ex. B at 7–8.

**\*10** Daniel presented little evidence regarding ABM's decision. During her deposition, she testified that the day after she was sent home from S & L, she was at ABM's offices when Garcia, the operations manager, called Lopez. She said she heard Lopez tell Garcia that she could not return to work at S & L. S & L Ex. 8 at 150–51. Daniel testified that she tried to explain her side of the story to Garcia, but he would not listen. *Id.* at 152–53. She also contends that ABM never actually investigated her situation during the time that she was suspended without pay.

Daniel has not presented any evidence suggesting that anyone at ABM knew anything more than what was contained in Lopez's e-mail or that ABM had any other reason to transfer her from S & L's offices other than Lopez's request. ABM received an e-mail stating that S & L would not allow Daniel to work at its offices anymore. Almost immediately, ABM suspended Daniel, and shortly thereafter it offered her a different position. There is no evidence to suggest that ABM did not honestly believe that S & L had barred Daniel from its offices because she was caught sleeping in a conference room. *Ptasznik,* 464 F.3d at 696 (pretext inquiry is focused on whether employer's stated reason is honest). There is nothing from which a reasonable jury could conclude that ABM's reliance on the e-mail as an explanation for its actions is a pretext for discrimination.

For present purposes, it is of no consequence whether, as Daniel contends, ABM failed to investigate before suspending or demoting her. "Even if [an employer's] reason for [the employee's] discharge was foolish or trivial or even baseless" the reason is not pretextual if the employer honestly believes the reason. *Gordon,* 246 F.3d at 889. "Title VII sanctions employers who discriminate, not those who are simply inept or incompetent." *Id.* Whether or not ABM investigated, there is no evidence to suggest that it did not honestly believe that S & L wanted Daniel removed for a nondiscriminatory reason, specifically because she had been caught sleeping in S & L's conference room.

Daniel also contends that ABM is effectively arguing that it should be allowed to cater to its customer's racial bias. She cites *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908 (7th Cir.2010), in which the court stated that "[i]t is now widely accepted that a company's desire to cater to the perceived racial preferences of its customers is not a defense under Title VII for treating employees differently based on race." *Id.* at 913. But that case involved a nursing home patient who stated that she did not want to receive care from African–American nursing assistants. *Id.* at 910. The nursing home responded by adopting a policy that forbade its African–American employees from helping the patient under any circumstances. *Id.* The nursing home thus made a decision to accommodate the bias of one of its patients. Similarly, the other cases cited by Daniel involve employers who made decisions based on race. *See Bellwood v. Dwivedi,* 895 F.2d 1521, 1530–31 (7th Cir.1990) (explaining in dicta that a merchant cannot refuse to hire African–American workers because they believe their customers prefer white workers); *Rucker v. Higher Educ. Aids. Bd.,* 669 F.2d 1179, 1180–81 (7th Cir.1982) (state agency could not refuse to hire a white applicant because some community members stated they preferred that the position go to an African–American). In this case, by contrast, ABM did not make a decision on the basis of race, and it did not adopt its customer's race-based preferences. Rather, ABM decided to remove Daniel from the S & L position after S & L said that Daniel was barred from its offices for violating S & L's rules. Daniel has not provided any evidence from which a reasonable jury could conclude ABM had any awareness that S & L had a racial motivation for barring her from working at its offices.

**\*11** Daniel does not contend that ABM acted as the "cat's paw" for S & L.

> In employment discrimination cases, the 'cat's paw' is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias. With sufficient evidence, ... juries [may] draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the

biased employee had some degree of influence over the ultimate decision.

*Schandelmeier–Bartels v. Chi. Park Dist.,* 634 F.3d 372, 379 (7th Cir.2011). In any event, the concept of cat's paw liability assumes that the person with the impermissible bias and the decision maker both work for the defendant employer, so that their actions are attributable to it. *See Staub v. Proctor Hosp.,* ––– U.S. ––––, ––––, 131 S.Ct. 1186, 1193, 179 L.Ed.2d 144 (2011) ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.").

Some district courts have assumed without discussion that the cat's paw liability theory would apply in cases where an employer's customer had an impermissible motive and complained about an employee to the employer. *See Brokaw v. Weiser Sec.,* 780 F.Supp.2d 1233, 1249 n. 26 (S.D.Ala.2011) (assuming that cat's paw theory could apply, but stating that it did not because customer did not have retaliatory motive and plaintiff's manager conducting his own investigation before terminating client); *Bartlett v. W.T. Harvey Lumber Co.,* 398 F.Supp.2d 1311, 1320–21 (M.D.Ga.2005) (cat's paw theory did not apply because client who complained about plaintiff did not have retaliatory motive). Those cases are distinguishable from the current situation. In both *Brokaw* and *Bartlett,* the defendant employer made its own decision to terminate the plaintiff after receiving complaints from a client. *Brokaw,* 780 F.Supp.2d at 1244 & n. 19; *Bartlett,* 398 F.Supp.2d at 1315–16. In this case, S & L simply told ABM that it would not allow Daniel to work at its offices anymore. ABM had no choice but to assign Daniel to a different position.

Furthermore, the Seventh Circuit has implicitly rejected, in a similar context, the application of cat's paw liability based on the motives of non-employers. In *Bullard v. Sercon Corp.,* 846 F.2d 463 (7th Cir.1988), Bullard worked for Sercon but was assigned to work at a Bethlehem Steel plant tending a coke oven. *Id.* at 465. Bethlehem had to lay off some coke oven employees. Lehner, a Bethlehem foreman, chose to lay off Bullard, claiming that he was a slow worker and spent too much time away from his work station. *Id.* After Sercon failed to assign Bullard to a new position, he sued it for race discrimination. The Seventh Circuit stated that

> [w]hether Lehner had good or bad, racist or innocent, reasons for choosing Bullard to lay off when it became necessary to lay off a member of the crew at the coke ovens, the layoff of Bullard was beyond Sercon's control. Sercon's culpability, if any, depends on what it did when confronted by Lehner's action.

**\*12** *Id.* at 466. The court concluded that there was no evidence that Sercon's failure to get Bullard a different position after he lost his job at the coke oven was racially motivated. *Id.* at 466–67.

Daniel's situation is similar to that in *Bullard.* S & L told ABM that she could not longer work at S & L's offices. ABM's liability, then, "depends on what it did when confronted by [S & L's] actions." *Id.* at 466. ABM eventually offered Daniel a position as a floater. Daniel concedes that there were no permanent positions available and offers no evidence that anyone at ABM had any racial animus against her.

No reasonable jury could find that ABM's explanation of its reason for removing Daniel from the S & L position and temporarily suspending her was a pretext. Accordingly, the Court grants summary judgment in favor of ABM.

## Conclusion

For the reasons stated above, the Court grants ABM's motion for summary judgment [docket no. 56] and denies S & L's motion for summary judgment [docket no. 49]. The case is set for a status hearing on March 21, 2012 at 9:30 a.m. for the purpose of setting a trial date on Daniel's claim against S & L.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 874419